**UNITED STATES OF AMERICA,**

v.

**Nina BAUM, a/k/a Nina Best, Defendant.**

**No. 03 CRIM.0085(LAK).**

United States District Court, S.D. New York.

Jan. 4, 2005.

Kevin Puvalowski, Assistant United States Attorney, David N. Kelley, United States Attorney, for U.S.

Nathan Lewin, Lewin & Lewin LLP, Paul K. Rooney, Paul K. Rooney, P.C., for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Defendant was convicted on her plea of guilty of passport fraud in violation of 18 U.S.C. § 1542. Over a year later, just before sentencing, she moved to withdraw the plea. The motion was denied and the defendant was sentenced principally to a term of imprisonment of 18 months.[1] This memorandum opinion sets forth the bases for the denial of the motion to withdraw the plea.

I

### A. Background

This case arose as a result of especially acrimonious matrimonial discord. A few of the details are essential to a proper understanding of the context of the present issue.

Defendant's former husband left her in early 1997 and shortly thereafter filed for divorce. The proceedings were long and extremely contentious. In June 1998, the former husband received temporary sole custody of the then-two year old child of the marriage, Rachel.

A protracted trial on custody and financial issues began in 1999. It ended on October 11, 2000 when the defendant and her counsel defied a direct order to recom-

---

1. This reflected a two level downward depar- ture.

mence the trial following a lengthy recess.[2] A subsequent motion to reopen and to recuse the trial judge was denied.[3]

In May 2001, Justice Walter B. Tolub of the New York Supreme Court rendered a 78–page decision, which concluded among other things that the defendant's "unfitness as a custodial parent is beyond doubt" and awarded permanent custody and sole decision making authority with respect to Rachel to the former husband, with defendant to have certain visitation rights.[4] On June 13, 2001, Justice Tolub entered an order suspending defendant's visitation rights immediately.[5]

Judgment was entered on June 29, 2001. As indicated in the decision, it awarded permanent custody and sole decision making authority to the former husband and certain visitation rights to the defendant.[6] Significantly, in light of arguments recently advanced by defendant, it provided in relevant part:

"ORDERED AND ADJUDGED, that ... the defendant shall have Rachel from August 1, 2001 through Labor Day, September 3, 2001, pursuant to the Findings of Fact (page 57, lines 3–5) ..."[7]

Both the cross-reference to the findings of fact and the context in which the foregoing appeared demonstrated clearly that the defendant's time with Rachel from August 1 through September 3, 2001 constituted visitation. And if there were any doubt about this—and there was none—it would have been eliminated by Justice Tolub's July 31, 2001 order reinstating defendant's visitation. The order stated as follows:

"Upon the foregoing papers, it is ordered defendant's motion to vacate this Court's order suspending her visitation with Rachel, her daughter is granted. The suspension order is hereby vacated and defendant's visitation schedule as set forth in the judgment of divorce is hereby reinstated effective July 31, 2001. Pursuant to the judgment of divorce, defendant shall have sole custody of Rachel from August 1, 2001 through Labor Day, September 3, 2001. **Transfer of custody shall occur on Tuesday, September 4, 2001 at 9:30 a.m.** * * * After Labor Day, defendant shall adhere to the visitation schedule set forth in the judgment of divorce."[8]

On August 29, 2001, according to the government, defendant procured a passport for the child using a letter bearing the forged signature of her former husband that purported to authorize issuance of the passport for the daughter. Days later, she left the United States with the child. Some time thereafter, defendant and the daughter were found living in Israel, allegedly under assumed names. The former husband obtained custody in Israel, by order of an Israeli court and the assistance of Israeli police, and returned to the United States with the child. Upon defendant's return to the United States in May 2002, she was arrested on a criminal complaint charging her with international parental kidnaping. The grand jury sub-

2. B. Best Aff. Ex. A, at 16–17. The date for recommencement of the trial had been set seven months before.

3. *Id.* at 17–18.
There was at least one further motion to recuse the trial judge. His order denying that motion was affirmed on appeal. *Best v. Best,* 302 A.D.2d 295, 754 N.Y.S.2d 542 (1st Dept. 2003).

4. B. Best Aff. Ex. A, at 54–56.

5. *Id.* Ex. C.

6. *Id.* Ex. B.

7. *Id.* at 7.

8. Def. Mem. Ex. 2 (emphasis in original).

sequently returned an indictment for passport fraud.

## B. Proceedings Culminating in the Guilty Plea

### 1. The Initial Appearance—January 21, 2003

The defendant first appeared before this Court on January 21, 2003, at which time she was represented by Joseph Grob, Esq., of the firm of Moskowitz & Book. Mr. Grob immediately sought to be relieved on the ground that his firm had been retained only to represent the defendant from her surrender upon her return from Israel through indictment and that it was not being paid to proceed further. The defendant opposed the application. The Court then explained to the defendant that it was obliged to allow Mr. Grob to move for leave to withdraw and that the defendant could retain new counsel to respond to that motion, respond *pro se*, or file an application for the appointment of counsel at government expense. It provided her with the financial affidavit required for that purpose It then directed that the motion for leave to withdraw be filed by February 4, asked the defendant to advise the Court by letter whether she intended to file the financial affidavit, and set the matter down for argument on February 24, 2003.[9]

### 2. The Appointment of CJA Counsel

The Court next convened on February 25, 2003.[10] On that occasion, the defendant withdrew her opposition to the motion of the Moskowitz firm for leave to withdraw, and the motion was granted.

The Court then took up a financial affidavit submitted by defendant that indicated vaguely that she might be entitled to money as a result of the matrimonial action. Although the defendant admitted that she was represented by counsel in that action, she was unable to inform the Court of her financial situation. The Court therefore appointed Gary Villanueva, Esq., under the Criminal Justice Act to represent defendant in this action, subject to the possibility that defendant might be obliged to reimburse the government depending upon her financial circumstances.[11] Motions were set for argument on April 28, 2003, and the case was set for trial on June 2, 2003.[12]

### 3. Defendant Retains Mr. Stern—April 28, 2003

When the matter was called on April 28, 2003, defendant was represented by David Stern, Esq., who had been retained privately. Mr. Stern indicated that he might seek an adjournment of the trial after becoming more familiar with the case.[13] In the ensuing weeks, the trial was adjourned—first at Mr. Stern's request until June 23, 2003, then until October 20, 2003, and finally until November 3, 2003.[14]

### 4. The Guilty Plea

#### (a) Defendant Directs her Attorney to Answer the Call "Not Ready"

When the case was called for trial on November 3, 2003, defendant's attorney, Mr. Stern, responded, "I've been directed by my client to say that I am not ready. That is not my position, but she has direct-

---

**9.** Tr., Feb. 4, 2003, *passim.*

**10.** The February 24 date was adjourned.

**11.** Tr., Feb. 25, 2003, at 1–4.

**12.** *Id.* at 5.

**13.** Tr., Apr. 28, 2003, *passim.*

**14.** Docket items 24, 27, 28.

ed me to say I'm not ready." [15] The defendant then told the Court that there were some facts that she thought were not clear to Mr. Stern.[16] The Court declared a recess to enable the defendant to confer with her counsel.

Following the recess, Mr. Stern advised the Court that things had not changed. He represented that he was ready to proceed and that he was prepared appropriately. The Court then said that it would proceed with the trial "unless there's anything else Ms. Baum cares to say to me." The defendant did not respond.[17]

### (b) The Disputed Stipulation

At that point, the government advised the Court that it wished to raise three preliminary issues: the defendant's desire to withdraw from a recent stipulation to the effect that the defendant had had visitation with the daughter in August 2001 and was to have returned her to the father on September 4, 2001 as well as the government's proposal to prove that (1) the former husband had been awarded sole custody by the state court, and (2) the defendant and the child had been living in Israel under assumed names.[18]

In the course of the argument, Mr. Stern advised the Court that it was the defendant herself—not he—who was objecting to the stipulation, this because it stated that she had had "visitation" in August 2001 whereas the state court order of July 31, 2003 used the word "custody." [19] He explained that he was anxious to keep the award of sole custody to the former husband out of evidence for fear of jury prejudice against the defendant [20] and that the stipulation was part of his strategy for accomplishing this objective. He elaborated as follows:

"I would like to be clear as to why [the stipulation] was signed. Just so the record is complete. It's in my estimation, as the Court is already aware, very important that the fact that the father got sole custody not be in the case. You may rule against me or not. I'm not suggesting how you would rule. But for me, that's a very important fact. By agreeing to this stipulation, and not making an issue of who had custody, I thought and think that it increases my chances of having that not come into court, since I understood it to be, as the Court has suggested, loose use of the word 'sole custody [sic],' in light of what the whole divorce decree said. It seems to me on the balance the appropriate thing to do." [21]

The Court construed counsel's remarks as an application by the defendant to be relieved of the stipulation, which it denied. It stated the following:

"It seems to me, first of all, that there are not adequate grounds for me to relieve the defendant of the stipulation signed by her attorney more than a week before trial, or approximately a week before trial, in circumstances where the attorney was fully informed of the terms of the judgment of divorce, and the subsequent order with respect

---

**15.** Tr., Nov. 3, 2003, at 2.

**16.** *Id.* at 4.

**17.** *Id.* at 5–6.

**18.** *Id.* at 7–8.

**19.** *Id.* at 14–15, 20.

**20.** He indicated his belief that it "is virtually unheard of in New York" for a father to get sole custody and said that he was concerned that "the jury may read into that that [defendant] is not a good mother, ... did something horrible." *Id.* at 9; *see also id.* at 12.

**21.** *Id.* at 22.

to the reinstatement of visitation rights. * * *"

"If I believed that counsel's action in signing the stipulation even remotely approached ineffective assistance of counsel, I would take a very different view of the matter. But I don't. It is clear to me listening to counsel reviewing the judgment of divorce, and having the subsequent order upon which the defendant herself now seeks to rely read out to me here in open court, that the state court's use of the word 'custody' in the subsequent order was meant not in its technical sense, that is, not in the sense that the word 'custody' was used in the judgment of the divorce to award sole custody to the husband, the ex-husband, but rather in a colloquial sense meaning the temporary possession, as it were, of the child for the relevant month. It was in no way inconsistent with the award in the judgment of divorce of sole custody to the father, and if I were to relieve the defendant of the stipulation, it would simply lead to useless and pointless confusion."

"In any case, it was surely an appropriate judgment on the part of defense counsel to sign the stipulation . . ."[22] * * *

"[I]t is quite plain it was a tactical judgment for what counsel justifiably viewed as a good tactical reason."[23]

### (c) The Plea

Following this ruling, discussion of another evidentiary issue, jury selection, and the midday recess, the Court saw the lawyers in the robing room at their request. Also present was Jeffrey Schwartz, Esq., a friend and former attorney of the defendant.[24] Mr. Stern advised the Court that the defendant was inclined to enter a plea and sought leave for Mr. Schwartz to be at the defense table. After a brief recess, Mr. Schwartz advised the Court that the defendant was "very fearful of going to trial" because she believed that there were avenues still to be investigated. Mr. Stern thereupon sought an adjournment, although he added in the same breath that "I have to say that I can't state the grounds for it."[25] Mr. Schwartz interposed that the defendant wanted further investigation done with respect to an unidentified expediter who, she evidently claims, would have testified that she had not submitted the forged letter to procure the passport and regarding "some other things."[26] But the Court denied the application,[27] whereupon Mr. Schwartz asserted that the defendant was "so nervous, she seems to be experiencing a bit of a breakdown."[28] The Court responded that it had not "see[n] any evidence of that."[29]

The Court then convened in the courtroom with defendant present. Mr. Stern renewed his application for a continuance in her presence. In response to a question from the Court, Mr. Stern acknowledged

---

22. *Id.* at 21–22.

23. *Id.* at 23.

24. *Id.* at 43.

25. *Id.* at 28–29.

26. *Id.* at 29.

This was the first mention of a desire to conduct unspecified further investigation regarding the expediter. When the defendant was afforded an opportunity to speak during the morning, she had not mentioned this. The "other things" Mr. Schwartz said were on her mind have not been specified to this writing.

27. *Id.* at 29–30.

28. *Id.* at 30.

29. *Id.*

that there was nothing new about the matters that the defendant wished to have pursued further; they had been known since the beginning of the case. The Court again denied a continuance.[30] Mr. Schwartz then took up the issue, again seeking a continuance. That application too was denied.[31]

At that point, defense counsel advised the Court that the defendant wished to enter a plea of guilty.[32] The defendant was placed under oath. The Court began as follows:

"Now, Ms. Baum, I understand that you're nervous and apprehensive. That's normal. This is going to take some time. If anything I ask you or anything I say to you is not clear, I want you to feel free to ask for clarification. If you need to talk to your lawyers, I'll give you that opportunity, within any reasonable limits. Do you understand?"[33]

The defendant said that she understood.[34]

The allocution initially proceeded in a routine fashion. When asked whether her mind was clear, defendant said that she was nervous but thought she was "thinking straight."[35] The attorneys voiced satisfaction that the defendant was competent, and the Court so found.[36]

The defendant then stated that she was satisfied with Mr. Stern's representation in the circumstances.[37] She added that she was relying also on Mr. Schwartz for legal advice and that, so far as Mr. Stern was concerned, "[t]here are things I disagree with, but generally I'm satisfied."[38]

Given the defendant's hedging as to her satisfaction with Mr. Stem's representation, the Court expressed concern about whether to accept a guilty plea. It stated that it was troubled by the possibility that the defendant was seeking to avoid proceeding with the trial by pleading guilty while preserving a collateral attack on the basis of ineffective assistance of counsel.[39] In other words, it raised the question whether the guilty plea was a pretense to obtain the continuance that the Court repeatedly had denied. It questioned whether the defendant had "the unqualified right to have it both ways; that is to say, to enter the plea and to preserve the possibility of subsequent challenge."[40] It therefore solicited argument as to whether the Court had discretion to reject the plea in view of the defendant's expressed reservations, noting also that it would accept a waiver of any claim of ineffective assistance of counsel based on anything known to defendant up to that moment.[41]

Following additional argument, Mr. Stern announced that the defendant was prepared to waive any claim of ineffective assistance of counsel. The Court responded as follows:

"And just to be clear, because it's very important, for everybody, most of all Ms. Baum, to understand that I'm not saying it's now or never or putting any

---

30. *Id.* at 31–33.

31. *Id.* at 33–36.

32. *Id.* at 36.

33. *Id.* at 37.

34. *Id.*

35. *Id.* at 41–42.

36. *Id.* at 42.

37. *Id.* at 42–43.

38. *Id.* at 43–44.

39. *Id.* at 45–46.

40. *Id.* at 46.

41. *Id.* at 47–48.

pressure on you, Ms. Baum, to make a hasty decision. If you and Mr. Stern and Mr. Schwartz want to defer on this, if you want to think about it overnight, that's fine. We'll start the trial, and if at any point before the jury comes back with a verdict you decide that, having thought about it more, you want to go ahead with a plea, that's okay. I'm not twisting your arm now to say you must waive your claim, if there is one, of ineffective assistance or something terrible will happen. That's not the case. Do you understand that?" [42]

The defendant answered that she understood.

The following colloquy then took place:

"THE COURT: Okay. Then let's address this issue concerning the reservations that have been expressed, Ms. Baum, about Mr. Stern. Do you understand that you have a right under the Constitution to be represented by counsel in this case?"

"THE DEFENDANT: Yes."

"THE COURT: And do you understand that you have the right to be represented by counsel who is effective, as that term has been construed by the Supreme Court in this context; that is, counsel must perform at an appropriate level of competence? Do you understand that?"

"THE DEFENDANT: Yes."

"THE COURT: Do you understand that if you were to be convicted here, either on a plea of guilty by you or by the jury, you ordinarily would have the right to challenge that conviction on the ground that your lawyer's representation of you had not met the minimum constitutional standard to which you're entitled, the minimum constitutional standard of effectiveness? Do you understand that?"

"THE DEFENDANT: Yes."

"THE COURT: And do you understand, therefore, that in ordinary circumstances, you could at any time before being sentenced, assuming your plea of guilty is entered and accepted today, seek to withdraw the plea on the ground that your lawyer's performance had been inadequate?"

"THE DEFENDANT: I just found that out, yes."

\* \* \* \* \* \*

"THE COURT: \* \* \* I understand from your attorney's comments that you are now prepared to waive any right to attack a judgment of conviction entered on the basis of the guilty plea that you apparently intended to enter, on the ground that your attorney's representation of you in this case has been inadequate or ineffective, is that correct?"

"THE DEFENDANT: Yes."

\* \* \* \* \* \*

"THE COURT: All right. Now, have you consulted not only with Mr. Stern but Mr. Schwartz about the consequences of such a waiver?"

"THE DEFENDANT: Yes."

"THE COURT: Do you understand, therefore, that if you do so waive, you will not be entitled to challenge your conviction in this case on the ground that any guilty plea you enter this afternoon came as a result of any ineffective or inadequate legal representation of you by Mr. Stern or anyone else, for that matter? Do you understand that?"

"THE DEFENDANT: Yes."

---

42. *Id.* at 50.

"THE COURT: I gather also, and it's an inference, not an explicit statement, but I think it's implicit, I gather also that you are prepared to waive any right to seek to withdraw any plea of guilty that you may enter this afternoon at any time prior to sentencing on the ground of ineffective assistance of counsel. Is that right?"

"THE DEFENDANT: Yes."

"THE COURT: And have you consulted fully with Mr. Stern and Mr. Schwartz on that subject?"

"THE DEFENDANT: Yes."

"THE COURT: All right. And do you now waive any right to challenge your conviction on a plea of guilty entered by you here today and any right to seek to withdraw that plea of guilty, in each case, on the basis of ineffective assistance of counsel?"

"THE DEFENDANT: Yes." [43]

Defendant's reservations concerning counsel thus having been dealt with, the allocution proceeded. Defendant first asked her attorney to obtain confirmation that her plea would cover all charges, including those that had not been brought [44] —evidently a reference to the parental kidnapping charge. The allocution then proceeded routinely. The defendant affirmed that she had not been threatened or "forced . . . in any way to plead guilty." [45] She then testified as follows:

"THE COURT: Did you, Ms. Baum, on or about August 29, 2001, in the Southern District of New York, which includes, among other places, Manhattan, the Bronx, and Westchester County, unlawfully, willfully, and knowingly make false statements in an application for a passport with in-

tent to induce and secure the issuance of a passport under the authority of the United States for the use of another, contrary to the laws regulating the issuance of passports and the rules prescribed pursuant to such laws, to wit, that you applied for and obtained a passport for the use of your daughter by submitting a forged letter purported to be from your ex-husband who was the custodial parent authorizing issuance of the passport?"

"THE DEFENDANT: Yes."

\*　　\*　　\*　　\*　　\*　　\*

"THE COURT: Please describe to me in your own words . . . exactly what it is that you did that in your mind makes you guilty of the offense with which you are charged."

\*　　\*　　\*　　\*　　\*　　\*

"THE DEFENDANT: I used a forged document to get a passport for my daughter."

"THE COURT: Did you know at the time that it was forged?"

"THE DEFENDANT: Yes."

\*　　\*　　\*　　\*　　\*　　\*

"THE COURT: And what did you do with the forged document to get a passport for your daughter?"

"THE DEFENDANT: I gave it to the passport agency."

"THE COURT: And what was the forged document?"

"THE DEFENDANT: A letter from my ex-husband."

\*　　\*　　\*　　\*　　\*　　\*

"THE COURT: Ms. Baum, what did the forged letter purporting to be from your ex-husband say, in substance?"

43. *Id.* at 51–54.

44. *Id.* at 57–58.

45. *Id.* at 63.

"THE DEFENDANT: Giving permission to get a passport for my daughter." [46]

At the conclusion of the allocution, the Court found that the plea was voluntary, that the defendant knowingly and voluntarily waived any claim of ineffective assistance of counsel, and that the plea was supported by an independent basis in fact containing each of the elements of the offense. It reiterated its prior finding that the defendant was fully competent to enter the plea based on subsequent experience with the defendant during the course of the proceedings.[47]

### C. Post–Plea Proceedings

On December 4, 2003, Mr. Stern addressed a letter to the Court, with copies to the defendant and the government, seeking to be relieved. The letter stated in relevant part:

"I write pursuant to Local Rule 1.4 to request that I be permitted to withdraw as counsel for Nina Baum in the above referenced matter on the grounds that the attorney-client relationship has been irreparably damaged during the weeks leading up to her guilty plea and thereafter Ms. Baum pled guilty pursuant to a plea agreement with the government during jury selection on November 3, 2003. I make this application at this time as there is still ample time and opportunity for substitute counsel to step in and effectively represent Ms. Baum at sentence. Moreover, it is crucial for Ms. Baum to have access to counsel whom she trusts and with whom she can communicate, and I have no ability to fill this role as Ms. Baum is deeply distrustful of every piece of advice I attempt to dispense or discuss with her in preparing for her upcoming sentence. (I note too that notwithstanding our agreement, Ms. Baum has failed to pay for the services I rendered on the date of her guilty plea, but this is not the basis of my application.)" [48]

The Court therefore set the matter down for a conference on December 17, 2003.

The defendant failed to appear on December 17 although Mr. Stern indicated that he had advised her by e-mail of the need to do so. So the Court adjourned the matter until December 19 and asked Mr. Stern to notify the defendant personally.[49]

Defendant again failed to appear on December 19, 2003. When asked whether he had notified defendant personally of the need to appear, Mr. Stern said that the defendant, when advised that "the judge has directed you to be there," "hung up on" him.[50] The Court thereupon issued a bench warrant for her arrest.

The warrant had not been executed by the time of the next conference on December 22, 2003, and the defendant then appeared with Mr. Schwartz as well as Mr. Stern. Mr. Schwartz did not deny that the defendant had been notified by Mr. Stern of the December 19 conference or that she had hung up on him after she was told that the Court had directed her to appear. He explained her absence by saying that she had been "highly stressed," that she was taking medication, and that her failure to appear "really was a confusion on her

---

46. Tr., Nov. 3, 2003, at 63–65.

47. *Id.* at 66.

48. Docket item 44.
It should be noted parenthetically that defendant did not plead guilty pursuant to a plea agreement with the government. This is a mistaken reference to the *Pimentel* letter provided at the plea.

49. Tr., Dec. 17, 2003, *passim*.

50. Tr., Dec. 19, 2003, at 2.

part."[51] The Court responded that Mr. Schwartz's comments raised the question "whether I need to order a competency examination."[52] The government professed its belief in defendant's competency, but acknowledged that "there's a little bit of instability here."[53] Later in the proceedings, the defendant claimed that she did not remember Mr. Stern's telephone call, presumably the one in which he told her to be present on December 19.[54] The Court thereupon ordered a competency examination.[55]

Toward the close of the proceedings on December 22, 2003, the Court raised the issue of Mr. Stern's application for leave to withdraw. Mr. Schwartz, speaking on defendant's behalf, said that she had not had sufficient time to think through the question whether she wanted a new lawyer and that an attempt might be made "to patch things up with Mr. Stern."[56] Accordingly, Mr. Stern's application was not ruled upon.

The defendant's competency examination appears to have been delayed by the defendant's failure to keep appointments and to cooperate with the court-appointed psychiatrist.[57] In late July 2004, however, Robert H. Berger, M.D., rendered his report. Broadly speaking, he found the defendant to be competent although suffering from *inter alia* a borderline personality disorder and a mixed personality disorder with histrionic, narcissistic, passive-aggressive, and self-defeating personality traits. In view of some of the arguments recently made by the defendant, it is appropriate to quote briefly from the report:

"Over the years, Ms. Baum has become so hyper-focused and singular in her quest that she has quite frankly not only lost the forest for the trees but has lost any sense of propriety. She has become self-righteous and can do no wrong, forever externalizing blame for negative outcomes and never accepting responsibility for these. To her, the end justifies the means and so, despite her Orthodox upbringing and her high moral and ethical standards, she seems to feel entitled to do anything to right what she perceives as wrongs with no regard for social and legal boundaries. She has lied, manipulated, and distorted. She audaciously and shamelessly extorted money from joint savings, she has defied court rulings, missed countless scheduled professional appointments, decided when or when not to be present for court appearances, filed multiple criminal and civil complaints of dubious merit, and fired or alienated close to ten experienced attorneys."

"On December 22, 2003, Ms. Baum suggested to this Court that she did not remember being informed by her attorney that she was to appear before Your Honor on December 18 [*sic*] and 19. This was hardly the first time that Ms. Baum had failed to make scheduled court appearances. She failed to appear as requested before Judge Tolub often enough for him to have drastically reduced her visitation rights in response to one such incident and he refused to yield or grant a continuance when she had failed to appear the day she was to resume her direct case at trial. Stating

51. *Id.* at 2–3.

52. *Id.* at 4.

53. *Id.* at 5.

54. *Id.* at 16.

55. *See* 18 U.S.C. § 4241(a).

56. Tr., Dec. 22, 2003, at 17.

57. *See* Report of Robert H. Berger, M.D. ("Berger Report"), at 9.

to this Court, on December 22, 2003, that she did not remember the conversation with her attorney was, at best, an impulsive rationalization, an ill conceived, immature, defensive reaction to confrontation by the Court regarding her negligent conduct. At worst, it was a conscious lie to conceal intentional obstruction of the court process and undermine the presentation of her attorney's motion to be excused from the case. It is my opinion that Ms. Baum's failure to appear in Court as scheduled was not a consequence of any emotional disturbance or cognitive impairment. Instead, it was an attempt, albeit misguided and defensive, to avoid confronting her situation and exert control over the proceedings. *Even now, Ms. Baum talks of vacating her voluntary plea in the same way that she had requested a mistrial in her custody case after she herself had refused to appear in court and knowingly refused to proceed with that trial.*

"Nina Baum is remarkably resourceful in the pursuit of her goals. She functions in a highly competent way concerning matters that are important to her. While she does march to the beat of her own drum, she also has the capacity to hear the drum of others—she just ignores it. She is self-serving in her intentions despite frequent self-defeating outcomes. * * * None of this rises to the level of mental disease or defect that would undermine her competency to proceed. *Ms. Baum is clear, concise, and rational when it is in her interest to do so, otherwise, she is vague, circumstantial, evasive and circuitous.*

*This is not mental illness; it is her style of combat."* [58]

The parties next appeared on August 6, 2004 at which time the Court, without objection, found the defendant competent on the basis of Dr. Berger's report.[59] It then asked defendant her position on Mr. Stern's still pending application to be relieved. Although the defendant had been copied on Mr. Stern's December 4, 2003 letter and in any case present on December 22, 2003 when the application was discussed at some length, she asserted that "[t]he application [presumably referring to Mr. Stern's December 4, 2003 letter] was never presented to me" and that she had not seen it before.[60] After being afforded an opportunity to read the letter, she indicated that she was unprepared to respond. When the Court asked, "Do you want me to release Mr. Stern, or not?", she answered "No." [61] She then asked for some time to discuss the matter with her family and others.[62] So the Court adjourned the matter until August 11.[63]

The parties appeared again on August 11 at which time the defendant stated that she had consulted with three lawyers other than Mr. Stern and that they were at a loss to understand what had occurred in light of the statement in Mr. Stern's December 4, 2003 letter than the attorney-client relationship had been irreparably damaged during the weeks leading up to the guilty plea.[64] The Court inquired whether there was any reason why it should not relieve Mr. Stern. The defendant responded in pertinent part as follows:

---

**58.** Berger Report at 12–14 (emphasis added) (footnotes omitted).

**59.** Tr., Aug. 6, 2001, at 2.

**60.** *Id.* at 5.

**61.** *Id.* at 6–7.

**62.** *Id.* at 9–10.

**63.** *Id.* at 10.

**64.** Tr., Aug. 11, 2004, at 2–3.

"Well, prior to the plea, the situation was the same as it is today. There are some issues in which there were stipulations that were entered into that are false. The information in the stipulations are false."

"I still am trying to figure out what happened. I don't have all the transcripts, so I am trying to get them, as your Honor knows."

"Your Honor didn't relieve him prior to the plea. The situation was the same as it is now." [65]

After further discussion, during which Mr. Stern said that he could not continue in view of the fact that defendant evidently was going to charge him with ineffective assistance, defendant reiterated her opposition to having Mr. Stern relieved as counsel.[66] She went on to say that she had been advised by another lawyer—who never entered an appearance in the case— "not to say that I want Mr. Stern to be relieved until some sort of mutual agreement can be made for him to represent me, because at this point he still can't understand what happened, and I don't anticipate that another lawyer would have a different opinion because I went to three already." [67]

At that point, the Court granted Mr. Stern's application, whereupon the defendant interjected:

"Mr. Stern writes in his letter that the situation is the same weeks leading to the plea [sic]. So I respectfully request that your ruling be effective of those weeks up until the plea." [68]

The Court declined.[69] A conference was scheduled for September 8 and the sentencing for October 15, 2004. The Court advised defendant of her right to be represented by counsel and to have counsel appointed for her if need be.[70]

Defendant appeared alone at the conference on September 8, 2004. In response to the Court's inquiry as to whether she had retained counsel, the defendant asserted that she was finding it difficult to do so because Mr. Stern had refused to turn the file over to potential successors. The Court therefore requested Mr. Stern to attend later in the day. Upon resumption of the proceedings, he represented to the Court that neither the defendant nor anyone else had requested the file and agreed to turn it over immediately.[71] The Court then adjourned the sentencing until December 10, 2004.

By mid-October 2004, no notice of appearance or application for the appointment of counsel had been filed on defendant's behalf. The Court therefore scheduled another conference for October 22, 2004 for the purpose of determining the status and making a more formal record in which she again would be advised of her right to counsel, counseled against proceeding *pro se,* and urged to obtain an attorney.

The Court began the proceedings on October 22 by asking the defendant whether she had retained counsel. She began her response by complaining that Mr. Stern had not turned over her file or returned the fee he had been paid and that this was interfering with her ability to

---

**65.** *Id.* at 4.

**66.** *Id.* at 7.

**67.** *Id.* at 7–8.

**68.** *Id.* at 8–9.

**69.** *Id.* at 9.

**70.** *Id.* at 12–15.

**71.** Tr., Sept. 8, 2004, 4:30 P.M., at 2–3.

obtain a lawyer.[72] She then proceeded to complain that an order by a state court judge had tied up funds that had been designated for her.[73]

The Court then began a series of questions suggested by the *Benchbook for U.S. District Judges* for the purpose of advising a defendant of his or her right to counsel and ability to have counsel appointed at public expense if the defendant is unable to afford private counsel as well as of the inadvisability of proceeding without counsel.[74] The defendant, however, was unresponsive and often argumentative. For example:

"THE COURT: Do you understand that if you demonstrate your financial eligibility, I will appoint an attorney for you?"

"THE DEFENDANT: However, I'm in a difficult position because—"

"THE COURT: Ms. Baum, that is a yes or no. Do you understand that if you can demonstrate that you are financially eligible for the appointment of an attorney at public expense, I will appoint one?"

"THE DEFENDANT: I don't know how to do that."[75]

"THE COURT: You don't know how to do that?"

"THE DEFENDANT: Make that representation."

"THE COURT: Make what representation?"

"THE DEFENDANT: Mr. Stern represented on the record prior to the scheduled trial that we were having irreconcilable differences, and you wouldn't let him off the case. You continued to direct him to represent me."[76]

The proceeding continued in this vein for some time. Eventually, the defendant was asked whether she understood that the Court would not advise her on how to conduct the proceeding if she represented herself at sentencing. The defendant responded that her "anxiety level" was "incredibly high," that she could "barely understand what [the Court was] asking," and sought an adjournment until she had a lawyer.[77] The Court thereupon found:

"that the defendant, who is a Bamard College graduate, quite an intelligent person and a person fully capable of understanding these proceedings, in fact understands these proceedings. She in fact is deliberately and willfully obstructing the proceedings of the Court by refusing to answer perfectly simple questions in an effort to delay and obstruct."[78]

It found that her actions constituted a criminal contempt of court.[79] At that point, the defendant burst out, insisting that she was having an anxiety attack and needed

---

72. Tr., Oct. 22, 2004, at 2.

73. *Id.*

74. *See* Federal Judicial Center, *Bench Book for U.S. District Judges* § 1.02 (4th ed. rev. 2000).

75. The procedure for applying for appointed counsel had been explained to the defendant on at least one prior occasion. Tr., Jan. 21, 2003, at 5–8. Indeed, she had filed such an application earlier in the case. *See* Tr., Feb. 25, 2003, at 3–5.

76. Tr., Oct. 22, 2004, at 3–4.

This assertion also was inaccurate. The only suggestion by Mr. Stern of irreconcilable differences with his client was in his December 4, 2003 letter, which post-dated the plea by over a month. Nor did the Court ever direct him to represent the defendant.

77. *Id.* at 12.

78. *Id.*

79. *See* FED. R.CRIM. P. 42(b).

to call her doctor.[80] The Court found that the outburst as well constituted a criminal contempt and remanded the defendant "until she assures the United States Marshal that she is prepared to participate in a cooperative way in these proceedings."[81]

The Court reconvened after a recess of about two hours. Mr. Stern, who had been summoned to respond to defendant's charges concerning his alleged refusal to turn over his file, was present and represented the defendant for the moment. The Court then resumed its questioning of defendant, who was considerably more cooperative. At its conclusion, it found that the defendant was fully aware of her right to counsel, including her right to seek the appointment of counsel if she were indigent, and added that the Court would treat a failure either to appear by retained counsel or to file an application for appointed counsel as a waiver of her right to counsel.[82]

The Court then turned to defendant's claim that Mr. Stern had interfered with defendant's ability to retain counsel by refusing to turn over the file. Mr. Stern flatly denied this, saying that the defendant herself came to his office with another lawyer and inspected his file, which then was turned over to her. He offered to produce a signed receipt.[83]

At the conclusion of the October 22 conference, the Court set sentencing for December 10, 2004, modified defendant's sentence on the contempt conviction to time served, and then instructed defendant to appear for the presentence interview as follows:

"Ms. Baum, I direct you to appear at the time and place directed by probation for the pre-sentence interview with or without counsel, whether you are represented or not. I am modifying your bail conditions to provide that your compliance with the direction by probation is a condition of your continuation on bail. If you don't show up, I will revoke your bail and will lock you up ..."[84]

In response to a direct question, the defendant responded that she understood.

Probation directed the defendant to appear for the presentence interview at 10 a.m. on November 3, 2004. The defendant, despite ample notice, failed to do so. As the details are not material here, it is sufficient to say that the defendant disputed whether she had been notified that she was obliged to appear on November 3, 2004 at 10 a.m., so an evidentiary hearing was held. After hearing testimony from a probation officer and the defendant, the Court found that the defendant was notified and that she deliberately had absented herself.[85] Bail was revoked. Defendant appealed, but the order of revocation was affirmed summarily.[86]

### D. The Motion

The motion claims in substance that defendant pleaded guilty because she was faced on November 3, 2003 with the imminent commencement of the trial; was somewhat dissatisfied with her attorney, primarily because he had entered into the factual stipulation; suffered from a personality disorder; and "was in no position

---

80. Tr., Oct. 22, 2004, at 13.

81. *Id.*

82. *Id.* at 21–22, 24–25.

83. *Id.* at 23.

84. *Id.* at 25.

85. Tr., Nov. 9, 2004, at 62–71.

86. *United States v. Best,* No. 04–5984 (2d Cir. Nov. 23, 2004).

to make an intelligent choice." [87] In sum, according to counsel, she "was not capable of making an intelligent decision to plead guilty, nor to waiving a claim of inadequate assistance of counsel." [88]

Notably, defendant initially submitted no affidavit with the motion. Hence, she did not claim under oath that she was innocent of the crime to which she pleaded guilty. Nor did she state under oath what her state of mind was when she entered the plea.

In opposing the motion, the government stressed the lack of any affidavit from defendant attesting to her claimed innocence. Accordingly, on the day prior to the scheduled sentencing, defendant submitted an affirmation that states, in its entirety:

> "I am not guilty of the charge in the indictment that on August 29, 2001, that I unlawfully, willfully, and knowingly made false statements in an application for a passport with intent to induce and secure the issuance of a passport under the authority of the United States, for the use of another, contrary to the laws regulating the issuance of passports and the rules prescribed pursuant to such laws."

Thus, the affirmation simply tracked the language of the statute. It did not deny that the defendant knowingly gave a forged letter purporting to be from her ex-husband to the passport agency in order to obtain a passport for her daughter. Nor did it provide any basis for concluding that defendant was not fully competent at the time of her plea, that she did not knowing-

ly and voluntarily enter the plea, or that she felt coerced in any way.

## II

▬ Rule 11(d)(2)(B) permits withdrawal of a guilty plea prior to the imposition of sentence "if ... the defendant can show a fair and just reason for requesting the withdrawal." Thus, although it sometimes has been said that motions to withdraw guilty pleas should be liberally granted,[89] the defendant "bears the burden of showing that there are valid grounds for withdrawal." [90] "The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea." [91] Rather, in determining whether there is a fair and just reason for withdrawal of a guilty plea, a district court should consider:

> "(1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea. Courts may also look to whether the defendant has 'raise[d] a significant question about the voluntariness of the original plea.' The standard for withdrawing a guilty plea is stringent because 'society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also

---

**87.** Rooney Aff. ¶ 35.

**88.** *Id.* ¶ 36.

**89.** *E.g., United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992).

**90.** *United States v. Schmidt,* 373 F.3d 100, 102 (2d Cir.2004) (citing *United States v. Couto,* 311 F.3d 179, 185 (2d Cir.2002)).

**91.** *United States v. Gonzalez,* 970 F.2d at 1100.

increases the volume of judicial work, and delays and impairs the orderly administration of justice.' " [92]

## A. Innocence

■ The defendant admitted her guilt under oath on November 3, 2003. She now claims that she is not guilty of the offense, resting the contention in part on legal arguments of counsel and in part on her affirmation.

■ Defense counsel first argues that no crime was committed because there was no false statement in the passport application itself, only in the letter bearing the forged signature of defendant's ex-husband. The forged letter, however, was part of the passport application.[93]

■ Defendant argues also that the forged letter was immaterial because defendant had sole custody of the child at the time. As indicated above, and as more elaborately set out in the government's memorandum,[94] this assertion is entirely without merit. The state court order of July 31, 2003 did not give defendant custody of the child in the sense of making her a custodial parent and thus giving her the authority to obtain a passport on the child's behalf. As the context makes over-whelmingly clear, it used the word "custody" to refer to visitation and temporary physical control.

We come then to defendant's affirmation, in which she denied—in the precise language of the statute—having committed the crime. This carefully crafted document appears to have been designed to chart a course between the Scylla of a perjury indictment and the Charybdis of proceeding with this motion without a claim of innocence. But it is not very helpful to the defendant.

The defendant testified under oath on November 3, 2003 that she knowingly gave the passport agency a forged document, purportedly signed by her ex-husband and authorizing the issuance of a passport to her daughter. The affirmation did not deny this. Thus, her claim of innocence, which was entirely conclusory, necessarily rested either on contradiction of the sworn statements made by her at the time of the plea or on the technical defenses raised by her counsel. Neither is sufficient.

First, a "strong presumption of verity" attached to defendant's sworn statements at the time of the plea.[95] Conclusory denials such as this are entitled to little weight.[96] Claims of innocence in this con-

---

**92.** *United States v. Schmidt*, 373 F.3d at 102–03 (citations omitted) (quoting *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.1997), and *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir.1997)).

**93.** *See* 22 C.F.R. § 51.20 ("An application for a passport or for an amendment of a passport shall be completed upon such forms as may be prescribed by the Department. The passport applicant shall truthfully answer all questions, and shall state each and every material matter of fact, pertaining to his or her eligibility for a passport. All information and evidence submitted in connection with an application shall be considered a part thereof.") Moreover, as the government has demonstrated, the application form itself contained two false statements—(1) that the child would be flying to London when in fact the defendant took her to Tel Aviv and (2) that the father's consent was attached when in fact the attachment was a forgery and known by the defendant to have been a forgery. And defendant's affirmation does not deny that she made both of those false assertions.

**94.** Gov't mem. at 13–14.

**95.** *See Gonzalez*, 970 F.2d at 1101 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)).

**96.** *See, e.g., United States v. Hirsch*, 239 F.3d 221, 225 (2d Cir.2001).

text instead should be supported by evidence.[97]

Second, to whatever extent defendant's affirmation properly was understood as a claim of factual innocence, it necessarily contradicted defendant's sworn allocution. Such efforts also are of little moment.[98] As our circuit said not long ago, a "defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." [99]

Finally, the claim of innocence, to whatever extent it rests on the technical defenses that the forged letter was not material or not part of the passport application, would be entitled to little weight even disregarding the fact that those defenses lack inherent merit.[100]

In sum, then, the claim of innocence here was an exceedingly weak one. To whatever extent it is factual, it was conclusory, unsupported by evidence, and contradicted defendant's statements at the time of the plea. To the extent it was based on legal defenses, it would have commanded modest attention even if those defenses were substantial—and they are not.

## B. Delay

Defendant delayed more than a year between entering the plea of guilty and moving to withdraw it. In ordinary circumstances, this factor unquestionably would weigh heavily against her. In this case, closer attention is warranted because the course of proceedings since the plea has been complex.

On December 4, 2003, defendant's counsel at the time of the plea, Mr. Stern, applied by letter to be relieved. The Court scheduled a hearing on that application for December 17, 2003. Defendant, however, failed to appear. The matter was rescheduled for December 19, 2003. Defendant again failed to appear.

Defendant finally appeared in court on December 22, 2003 accompanied by Messrs. Schwartz and Stern. Given Mr. Schwartz's statements, the Court ordered a competency examination, the report of which was not received until on or about July 28, 2004.

The Court held another hearing on August 6, 2004 at which time the Court found the defendant to be competent and adjourned consideration of Mr. Stern's application to be relieved in order to give defendant—who declined to agree to the withdrawal and who had known of the application since December 2003—additional time to consider it. On August 11, 2004, the Court granted Mr. Stern's application over defendant's objection. Significantly, defendant, who had reported that she had consulted with several other attorneys, then asked that the "ruling be effective of those weeks up until the plea [*sic* ]" [101]—a clear indication that she already was laying the groundwork for an application to withdraw the plea. The Court then set the matter down for a status conference in September "to find out where we are on the issue of legal representation." [102]

---

**97.** *Id.*

**98.** *E.g., Gonzalez,* 970 F.2d at 1100–01; *see also United States v. Diaz,* 176 F.3d 52, 114 (2d Cir.1999) (declining to remand for an evidentiary hearing when the defendant's sworn statements during a proper plea allocution contradicted his claim on appeal that his guilty plea was involuntary).

**99.** *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997).

**100.** *E.g., United States v. Harris,* 160 F.2d 507, 509–10 (2d Cir.1947) (A.N.Hand, J.).

**101.** Tr., Aug. 11, 2004, at 8–9.

**102.** *Id.* at 15.

Conferences took place in September and October. In each case, defendant appeared without a lawyer. In neither case did she apply for appointment of counsel. So it was not until November 9, 2004, when one of her present counsel entered the case, that defendant finally obtained a lawyer.

■ Defendants may not be permitted to bring federal criminal proceedings to a halt by the simple expedient of refusing to hire counsel, refusing to apply for the appointment of counsel, and refusing to proceed *pro se*. That is what this defendant did from the moment Mr. Stern was relieved on August 11, 2004, until the motion to withdraw the plea finally was made on November 24, 2004.

Nor was there any excuse for this behavior. Defendant is an intelligent, articulate, well educated person.[103] As Dr. Berger concluded, she "is of superior intelligence."[104] She was aware, based on her consultations with counsel who never entered an appearance and the content of the August 11, 2004 conference, of her right to move to withdraw the plea on precisely the grounds now asserted. Indeed, she discussed precisely that with Dr. Berger at some point during the period March 2 through June 16, 2004.[105] There is no apparent reason why she could not have retained or sought appointment of new counsel once Mr. Stern was relieved and moved for that relief.[106]

The earlier period superficially presents a somewhat closer question because Mr. Stern remained counsel of record during that period and could not reasonably have been expected to have challenged the plea, at least on the grounds that defendant now advances. But all or most of the delay from December 4, 2003 until August 11, 2004 was her fault as well.

To begin with, while it is true that Mr. Stern's application to be relieved remained pending during that period as a result of the need for a competency examination of the defendant, the long delay in the completion of that examination was largely or entirely defendant's fault. She appears to have delayed that process by repeatedly failing to appear for appointments with the psychiatrist. But even that ultimately is immaterial.

Defendant expressed some dissatisfaction with Mr. Stern on November 3, 2003. Even if she never got the copy of his December 4 letter that was e-mailed to her, she knew no later than December 22, 2003 that he wished to be relieved. Indeed, it is a premise of her recent motion—although it is not supported by her affirmation—that the attorney-client relationship had broken down even earlier. Yet defendant inexplicably failed to discharge Mr. Stern, obtain a new lawyer, and seek whatever relief she thought appropriate.

In view of this history, defendant is chargeable with the entire delay from December 22, 2003 until the motion ultimately was made on November 24, 2004. Even viewing the record far more charitably in her favor than is warranted, she would be

---

**103.** This is entirely apparent from reading her remarks at various court proceedings when it evidently served her interests to present herself in this light.

**104.** Berger Report at 6.

**105.** *Id.* at 1–2 (dates of consultations), 14 (discussion of interest in withdrawing plea).

**106.** As noted elsewhere, defendant claimed more than once that her efforts to find new counsel were hindered by Mr. Stern's refusal or failure to turn over his file. Mr. Stern denied this at least twice and offered to produce a receipt. The Court does not credit defendant's claims in this regard.

chargeable at least with the delay from August 11, 2004 until November 24, 2004. Whether viewed as an unjustified delay of three and a half months or of thirteen and a half months, the delay cut heavily against the motion.[107]

### C. Prejudice

The government argued that it would be prejudiced by withdrawal of the plea because a number of its witnesses would be inconvenienced by preparing again for trial, having done so already, and because one of its witnesses is moving to Israel in January 2005. As it acknowledged, the degree of prejudice would be modest. This, however, is but one factor in the analysis.[108]

### D. Voluntariness

Defendant, who previously swore that she was not "forced ... in any way" to plead guilty, now claims that the plea was not voluntary. She contends that she was upset, that her lawyer was unprepared, that the Court denied a continuance of the trial, and that she was on medication. These arguments, whether taken individually or in the aggregate, are insufficient even to raise a substantial issue as to the voluntariness of the plea.

#### 1. Ineffective Assistance of Counsel

■ A plea of guilty may be rendered involuntary if it is entered in the absence of effective assistance of counsel. Contrary to defendant's contention,[109] however:

"We evaluate Defendant's claim that her guilty plea was involuntary or unknowing due to ineffective assistance of counsel using the framework established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *United States v. Hernandez,* 242 F.3d 110, 112 (2d Cir.2001) (per curiam) (citing *Hill v. Lockhart,* 474 U.S. 52, 57–58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). A defendant must first establish that 'counsel's representation fell below an objective standard of reasonableness.' *Hernandez,* 242 F.3d at 112 (quoting *Hill,* 474 U.S. at 57–58, 106 S.Ct. 366). Second, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.' *Id.* (quoting *Hill,* 474 U.S. at 59, 106 S.Ct. 366). 'The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo.' *Id.*"[110]

In this case, there appear to be three respects in which the defendant now claims that her counsel was ineffective—his entry into the stipulation, his failure adequately to pursue the expediter, and the alleged irreparable damage to the attorney-client relationship prior to the plea.

■ The issue of the stipulation has been discussed adequately already. Counsel entered into the stipulation for the

---

**107.** See Gonzalez, 970 F.2d at 1100 (delay of almost seven months undercuts motion); *Harris,* 160 F.2d at 509 (almost seven months); *United States v. Mignogna,* 157 F.2d 839 (2d Cir.1946) (seven months); *United States v. Kramer,* 168 F.3d 1196, 1202 (10th Cir.1999) (five months); *United States v. Alexander,* 948 F.2d 1002, 1004 (6th Cir.1991) (five months).

**108.** E.g., *United States v. Figueroa,* 757 F.2d 466, 475–76 (2d Cir.), *cert. denied,* 474 U.S. 840, 106 S.Ct. 122, 88 L.Ed.2d 100 (1985).

**109.** Tr., Dec. 10, 2004, at 16–17.

**110.** *United States v. Couto,* 311 F.3d 179, 187 (2d Cir.2002).

purpose of strengthening his argument that the fact that the defendant's ex-husband had been awarded sole custody of the daughter should be kept out of evidence. He did so for fear that the jury, were it to learn of that fact, would be prejudiced against the defendant and think her a poor mother. This is precisely the sort of tactical judgment that will not be second guessed on a claim of ineffective assistance of counsel.[111] Defendant's contention that counsel's explanation for the stipulation should not even have been considered[112] simply is wrong. Nor does defendant contend that she would have gone to trial had Mr. Stern not entered into this stipulation.

 The claim relating to the failure to pursue the expediter is no stronger, especially in light of defendant's admissions during the plea. Where a defendant seeks to upset a conviction on the ground that counsel had failed adequately to investigate possibly helpful witnesses, the defendant must give some reason for believing not only that effective assistance required that investigation, but that there was a basis for thinking it would have been helpful. While defendant's counsel argued, in unsworn statements concerning matters of which he had no first hand knowledge, that investigation might have shown that the passport application was filed by an employee of the expediting firm rather than the defendant and that the forged letter was attached without her knowledge, there is no such evidence. Certainly the defendant's affirmation does not deny that she filed the application, including the forged letter, with the passport office. Indeed, she swore in the course of the plea proceedings: "I gave it [the forged letter] to the passport agency."[113]

Even assuming that further investigation might have yielded proof that the documents in fact were carried to the passport office by the expediting firm, there is no basis for supposing that any witness would have testified that the forged letter did not come from the defendant and was used without her authority. There is, in consequence, no basis for supposing that there was a helpful witness out there or that defendant would not have pleaded guilty if Mr. Stern had investigated that possibility further.

 The argument concerning he alleged irreparable damage to the relationship between Mr. Stem and the defendant dating to before the guilty plea at first appears a bit more substantial. The Court assumes *arguendo* that a complete inability of counsel and a defendant to cooperate in a defense could well result in a deprivation of the effective assistance of counsel. But there is little reason to suppose that anything of the sort occurred here.

For one thing, neither defendant's affirmation nor her statements during the plea support any such finding. The affirmation is entirely silent on the subject. Moreover, when defendant was asked during the plea proceedings whether she was satisfied with Mr. Stern and the representation he had provided to her, the following took place:

"THE DEFENDANT: Under the circumstances, yes."

"THE COURT: You're obviously qualifying your answer, so you're going to have to tell me in what respect, if at all, you're not satisfied with the legal representation that Mr. Stem has provided to you."

---

**111.** *E.g., Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**112.** Tr., Dec. 10, 2004, at 17.

**113.** Tr., Nov. 3, 2003, at 65.

"THE DEFENDANT: There are things I disagree with, but generally I'm satisfied."[114]

The Court then inquired of Mr. Stem, who responded:

"I think that what she says, the Court already knows, that, for example, she disagrees with stipulations I entered into, that she may disagree with other tactical decisions that, while they may not come into play, I had indicated that that's what I intended to do in her case, so I think, and she'll correct me if I'm wrong, that she has disagreements with me about how to proceed with the case. That doesn't, I don't think, render my assistance to her ineffective. It doesn't always make her happy, and those are two very different things, I think."[115]

A few moments later, Mr. Schwartz stated, "Judge, I think Ms. Best has reconsidered and she is happy with her attorney's performance. She's willing to state that on the record."[116]

Following these exchanges, the elaborate colloquy quoted above, which included the Court's advice that the defendant should feel under no pressure to make a decision, and consultation with both Messrs. Stern and Schwartz, the defendant agreed to waive any claim of ineffective assistance of counsel. Moreover, even after the plea was entered, the defendant stalled in responding to, and ultimately opposed, Mr. Stern's application for leave to withdraw from the case.

On this record, the Court does not regard a finding that there was irreparable damage to the relationship between the defendant and Mr. Stern prior to the plea as justified. Defendant was given every opportunity to say that this had occurred, but stated instead that she was generally satisfied with her counsel although there were things that she had disagreed with. Mr. Stern, for his part, said nothing at the plea proceedings about irreparable damage to the relationship. To the contrary, he said that there were disagreements about tactics, but nothing more. His December 4 letter therefore must be taken as hyperbole intended to justify the motion for leave to withdraw.[117] In any case, defendant has not claimed under oath that she would not have pleaded guilty had she been represented by someone with whom she might have communicated more easily.

### 2. The Denial of the Continuance

Motions for continuances made at the start of trial, as was the case here, are addressed to the sound discretion of the district court. The exercise of that discretion to deny a continuance will be sustained unless the denial "was arbitrary and substantially impaired [the] defense."[118]

In this case, the denial was not arbitrary. The case had been delayed repeatedly by defendant's changes of counsel. The defendant's counsel assured the Court that he was prepared to proceed. When advised that it was the defendant herself who regarded counsel as unprepared, the Court inquired carefully into the reasons for her belief and found them wanting. That was its proper role. Nor, for the reasons discussed above, has there

---

114. Tr., Nov. 3, 2003, at 43–44.

115. *Id.* at 44–45.

116. *Id.* at 46–47.

117. In so stating, the Court does not question Mr. Stern's veracity. It regards the statement

in the December 4 letter as an advocate's rhetorical characterization of precisely what he described during the plea proceedings.

118. *E.g., United States v. Edwards,* 101 F.3d 17, 19 (2d Cir.1996).

been any showing that the denial of the continuance substantially prejudiced the defense.

Of course, the issue here is not whether the denial of the continuance *vel non* was appropriate. Rather, it is whether the ruling, even if entirely appropriate, rendered the plea involuntary. But such an argument would be unpersuasive.

First, as shown above, the denial of the continuance did not leave defendant with no choice but to plead guilty. As the Court painstakingly explained to her, she had other options. She could have thought the matter over in consultation with both Messrs. Schwartz and Stern during the trial and, if persuaded to do so, entered a guilty plea at any time prior to verdict.[119] She could have tried the case to verdict and, if convicted, raised the alleged ineffective assistance of counsel in a post-conviction proceeding. There was no coercive dilemma.

Second, it must be borne in mind that the issue of coercion in this context is not a purely subjective one. "When a guilty plea is challenged as being the product of coercion, our concern is not solely with the subjective state of mind of the defendant, but also with the constitutional acceptability of the external forces inducing the guilty plea."[120] So, for example, "a State may encourage a guilty plea by offering substantial benefits in return for the plea," including "the possibility or certainty not only of a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty, but also of a lesser penalty than that *required* to be imposed after a guilty verdict by a jury."[121] Such offers often present defendants with choices among unpleasant alternatives. But the fact that a plea of guilty is the most attractive option for the defendant from a subjective point of view does not render its offer constitutionally coercive. In other words, regardless of a defendant's subjective state of mind, the Constitution does not make the pressure generated by such entirely appropriate facets of the criminal process inappropriate. So too here. The fact that the defendant, whatever her subjective state of mind, found a guilty plea preferable to going to trial after the continuance had been denied did not render the denial of the continuance coercive in any relevant sense.

### 3. Medication

Defendant's motion claimed that she was taking a host of medications at the time of the plea and implied that this somehow bore on its knowing and voluntary nature. This contention, however, was unsupported by any evidence based on personal knowledge as to what medications she in fact had been taking[122] or what effects any of those medications might have had.

During the plea proceedings, the Court inquired into the defendant's medical and psychiatric history, including any medications she had taken recently.[123] She stated under oath that the only medications she had taken in the preceding

---

**119.** Tr., Nov. 3, 2003, at 50.

**120.** *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir.1986); *cf. Miller v. Fenton*, 474 U.S. 104, 115–16, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) ("Although sometimes framed as an issue of 'psychological fact,' the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension.").

**121.** *Corbitt v. New Jersey*, 439 U.S. 212, 219–20, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978) (internal quotation marks and citations omitted).

**122.** Counsel's unsworn assertions, made without personal knowledge, are not entitled to consideration.

**123.** Tr., Nov. 3, 2003, at 38–41.

twenty-four hours were Vioxx, an unspecified antianxiety drug, and a pain killer, perhaps Preeocet.[124] There is no evidence that any of these medications was likely to have had any effect on the informed and voluntary nature of the plea. The defendant, moreover, said that she thought she was thinking straight, although she was very nervous. There is no basis for allowing withdrawal of the plea on the ground that it was not knowing and voluntary in light of the medication that defendant had taken.

\* \* \* \* \* \*

When all was said and done, the Court was not persuaded that defendant's plea was anything but knowing and voluntary. She was advised by counsel—not only Mr. Stern, but her friend Mr. Schwartz. There is no objective basis for supposing that her legal representation was deficient in any way, let alone ineffective in a constitutional sense. Nor was the Court's denial of a continuance inappropriate. Even if defendant subjectively thought she faced a Hobson's choice of a trial with an unprepared lawyer and a guilty plea—and her failure to say that under oath is telling—there was no objective basis for such a view. The Court is satisfied that the defendant knowingly and voluntarily pleaded guilty.

## III

The Court denied the motion to withdraw defendant's plea of guilty for the foregoing reasons.

SO ORDERED.